| | |
|---|---|
| OPTIMAL INTERIORS, LLC,<br><br>     Plaintiff,<br><br>vs.<br><br>THE HON COMPANY,<br><br>     Defendant. | **No. 3:09-cv-00177 – JEG**<br><br>**O R D E R** |

This matter comes before the Court on Motion for Partial Summary Judgment brought by Defendant The HON Company (HON). Plaintiff Optimal Interiors, LLC (Optimal) resisted and filed a Cross-Motion for Partial Summary Judgment. The Court held a hearing on the motions on January 13, 2011. Attorneys Michael W. Thrall and David T. Bower represented HON. Attorneys Robert W. Hayes and Christopher P. Jannes represented Optimal. The matter is fully submitted and ready for disposition.

## I.    BACKGROUND[1]

HON[2] sells furniture to private businesses, educational institutions, and government entities largely through a national network of dealers and retailers. Optimal is a software development company that licensed IOPro software (IOPro) to customers. Although IOPro has various capabilities, relevant to this case, IOPro "provides users with the ability to plan and manage the Furniture, Fixture and Equipment (FF & E) element for an Education facility in all phases of construction and after, continuing through ongoing facility management." Pl.'s Resistance App. 57, ECF No. 65-4.

---

[1] The facts of this case are either not in dispute or are viewed in the light most favorable to the non-moving party. See Smith v. Hy-Vee, Inc., 622 F.3d 904, 907 (8th Cir. 2010) (per curiam).

[2] HON is a wholly owned subsidiary of HNI Corporation.

In late 2007, HON and Optimal began discussions regarding the formation of an agreement that would make IOPro available to HON's educational furniture dealers. HON viewed IOPro as a potentially useful tool for its educational dealers. Bruce Reinhart (Reinhart), National Education Sales Manager for HON, remarked that he "saw it as a strong tool to help dealers want to work more closely with HON." Reinhart Dep., Def.'s App. 24, ECF No. 60-3. Reinhart believed that IOPro "was something that would help the market better see HON in an education perspective," and that it would help HON dealers save time and money. Id. at 23-24.

On August 18, 2008, HON and Optimal executed a written agreement entitled "Optimal Interiors, LLC HON Distribution Partner Agreement" (the Agreement). Def.'s App. 1, ECF No. 60-3. Jeffrey Lorenger (Lorenger), HON Vice President of Sales, signed the Agreement on behalf of HON, and IOPro developer John Harvey (Harvey) signed the Agreement on behalf of Optimal. The Agreement recited that "the parties desire that HON distribute [IOPro] and certain other programs and services to its dealer network, end users and other potential subscribers that would benefit from utilizing [IOPro] to assist in planning, marketing and distributing of HON products." Agt. Sect. A, Def.'s App. 1, ECF No. 60-3. The Agreement provided that HON would be the distributor for "(a) Single Project Application Licenses to Subscribers for their use of one or more [IOPro] modules, (b) subscriptions to the HON-OI Dealer Program, and (c) [Optimal]'s consulting and other services described herein . . . ." Agt. Sect. 21, Def.'s App. 3, ECF No. 60-3. Under the Agreement, a HON-OI Dealer Program "means that subscription-based program to be made available to Dealers and pursuant to which each subscribing Dealer will be provided those certain rights and benefits with respect to [IOPro] that are set forth [in the Agreement]." Agt. Sect. 1.11, Def.'s App. 2, ECF No. 60-3. The Agreement provided that "[s]ubscription to the HON-OI Dealer Program will initially be made available to any Dealers, up to the point where there are 50 Subscribers, unless HON and [Optimal] mutually agree to

extend the number of Dealer participants in the program."[3] Agt. Ex. B, Def.'s App. 18, ECF No. 60-3. Under the terms of the Agreement, dealers that subscribed to the HON-OI Dealer Program would enter into a separate agreement with HON to which Optimal would not be a party and pay HON directly for the use of IOPro.

The term of the Agreement commenced on the effective date and was to continue for a period of five years, with an option for the parties to renew upon mutual agreement. Id. at 10. While the Agreement was in effect, Optimal agreed that "it [would] not license [IOPro] to any HON Competitor for purposes of selling Furniture to Educational Institutions within the Territory." Agt. Sect. 2.5, Def.'s App. 4, ECF No. 60-3. In order to maintain this exclusivity, HON was required to make minimum payments of "at least $300,000 during each six (6) month period commencing on January 1st and July 1st of each calendar year." See Agt. Sect. 1.12, Def,'s App. 2, ECF No. 60-3.

The Agreement further provided that HON would pay Optimal an implementation fee of $20,000 for each dealer that subscribed to the HON-OI Dealer Program and that HON would pay an annual renewal membership fee of $10,000 per dealer that remained subscribed. HON also agreed to purchase a minimum of twenty-four memberships to the HON-OI Dealer Program for a total cost of $480,000; twelve of those memberships were to be prepaid on the effective date of the Agreement.[4]

---

[3] Optimal asserts that the parties contemplated that IOPro would eventually be utilized by more than fifty dealers. See Pl.'s Resistance App. 57, ECF No. 65-4 ("At fruition, it is thought that approximately 100 of the current HON dealers would [sic] be working in support of HON in the education market and utilizing HON powered by oi as a tool to create a competitive advantage.").

[4] HON and Optimal later agreed to amend the Agreement and allow HON to pay the initial $240,000 to Optimal in four installments of $60,000. HON Vice President of Government and Educational Sales Michael Paar (Paar) acknowledged that this was done "because of resistance [HON was] getting from [HON] dealers in accepting the program." Pl.'s App. 55, ECF No. 61-1. Although HON admits that it made initial payments totaling $240,000 to Optimal for twelve dealer membership fees, HON maintains that it did not agree to pay any additional money under

HON was required to pay Optimal a single-project application licensing fee when a dealer utilized one of the three modules that comprised IOPro: "Plan & Buy," "Draw & Spec," and "Spec & Manage." Agt. Ex. A, Def.'s App. 15, ECF No. 60-3. The single-project application licensing fee was $5,000 per module. The Agreement provided for the payment of royalties from HON to Optimal "in an amount equal to three percent (3%) of the net price of any and all HON Products that were modeled through the use of the Application and ordered by the customer." Agt. Ex. A, Def.'s App. 16, ECF No. 60-3.

HON and Optimal also included requirements in the Agreement to ensure that IOPro was promoted and marketed to dealers. The Agreement mandated that HON and Optimal develop a Dealer Marketing Plan within sixty days of the Agreement's execution and that the Dealer Marketing Plan would be funded with monies generated by the annual dealer membership renewal fees.[5] However, there was no requirement that the Dealer Marketing Plan be memorialized in writing. Further, the parties agreed to meet once per year in order to agree on a marketing budget and to decide how to implement the Dealer Marketing Plan. HON also agreed that it would "use good faith efforts to implement the Dealer Marketing Plan and to ensure that HON's resources are allocated in such a manner to maximize the revenue potential of the [IOPro] and Furniture sold therewith." Agt. Sect. 4.2, Def.'s App. 6, ECF No. 60-3.

Reinhart had no prior experience introducing a software product into the marketplace. Although the Agreement did specifically require that a consultant assist in the development of a marketing plan, approximately one week after the Agreement was executed, Reinhart proposed to Harvey that the parties seek the assistance of a consultant to help develop a Dealer Marketing

---

the Agreement "until a HON dealer purchased a membership to sub-license the IOPro application." Def.'s Am. Answer ¶ 16, ECF No. 43.

[5] This deadline was later changed to sixty days after the execution of the first amendment to the Agreement, which was September 24, 2008.

4

Plan. In October 2008, Reinhart attempted to schedule meetings with three different consultants. However, Harvey felt that it was not important to meet with consultants at the time and commented that "[i]t seemed to me not a good use of our time to be meeting with consultants until we got through our dealers and got them signed." Harvey Dep., Pl.'s Reply App. 22, ECF No. 73-2. Reinhart was Optimal's sole point of contact at HON with regard to the development of a Dealer Marketing Plan.[6]

Although a formal Dealer Marketing Plan was never developed, marketing efforts began on October 1, 2008, as representatives from HON and Optimal traveled throughout the country and pitched IOPro to dealers. The parties dispute the effectiveness of these marketing efforts. HON notes that after six months of marketing efforts, only one dealer, Synergy Business Environments (Synergy), signed up for a subscription to the HON-OI Dealer Program.[7] However, Reinhart admitted that as of January 2009, he believed that seventeen dealers would sign up for a subscription. Optimal maintains that by February 2009, four dealers, including Synergy, had executed subscriptions agreements to the HON-OI Dealer Program, and that many other dealers were also interested in subscriptions.

HON and Optimal came to other agreements that were not included in the Agreement. In a July 28, 2008, email to Lorenger and Paar, Harvey wrote that "within the first 60 days of the contract, I will complete a formal business plan and a major component of that plan will be to complete financials for the 'HON – powered by oi' program." Def.'s Resistance App. 92, ECF No. 66-4. Harvey continued that "[t]his plan will include not only the sales and marketing side of [Optimal], but will cover elements such as hardware/equipment requirements, software

---

[6] Harvey alleges that in October 2008, he sent numerous emails to Reinhart about planning documents for the Dealer Marketing Plan. However, HON disputes that the emails Harvey sent related to the Dealer Marketing Plan.

[7] Harvey and Synergy signed an addendum to their agreement under which Optimal agreed to reimburse Synergy for all of its out-of-pocket expenses.

platform support and improvements, technical and customer service support, and perhaps most importantly operational and [Optimal] corporate management requirements." Id. Finally, Harvey remarked that he identified and planned to retain an outside consultant to help him with the development of a formal business plan. However, Optimal did not create a formal business plan within 60 days of executing the Agreement, or at any time, before the termination of the Agreement.

The Agreement provided for termination in a number of ways. First, the Agreement was set to expire automatically five years after the Agreement's effective date if the parties failed to renew. The parties could terminate "at any time upon the written mutual agreement of both parties." Agt. Sect. 8.2, Def.'s App. 10, ECF No. 60-3. In the event of a material breach, the non-breaching party could terminate the Agreement by providing the breaching party with thirty-days written notice and an opportunity to cure. Thirty days after the non-breaching party pro-vided the breaching party with notice and an opportunity to cure, the non-breaching party could unilaterally terminate the Agreement if the breaching party had not either cured the breach or taken steps to cure the breach if the breach could not be fully resolved within thirty days. Finally, the Agreement provided for termination for other causes, including insolvency or bankruptcy of one of the parties.

In the fall of 2008, Lorenger was replaced by Ric Andersen (Andersen). In February 2009, Andersen decided to seek termination of the Agreement, in part because sales to educational institutions were slumping, forcing HON to lay off workers. Reinhart explained that "HON experienced an unprecedented and unforeseen economic collapse that negatively impacted HON, HON's dealers, and the educational institutional customers who were the target consumers for the IOPro application." Reinhart Dep., Def.'s App. 30, ECF No. 60-3. However, Andersen did not identify any specific breach of the Agreement that Optimal had committed in justifying his decision to seek the termination of the Agreement.

Paar sent a letter to Harvey dated March 5, 2009, in which HON formally requested that Optimal agree to mutually terminate the agreement pursuant to the Agreement's mutual termination provision. In his letter, Paar remarked that HON felt termination was in the best interests of Optimal because Optimal would be able to market IOPro to competitors immediately "rather than waiting until July 1, 2009 to determine if the Minimum Payments are paid [by HON]," and that Optimal would be able to market IOPro directly to dealers and keep all of the profits. Pl.'s App. 42, ECF No. 61-1. Paar continued that "[i]f we cannot agree on mutual termination of the Agreement, HON will simply stop promoting the Application (which we have no obligation to do under the Agreement) and will let the five year Term run its course." Id. In seeking termination, Paar did not state that Optimal was in breach of its duties under the Agreement and did not provide Optimal with an opportunity to cure any alleged breach.

Optimal refused to mutually terminate the Agreement. In a letter dated March 12, 2009, sent from Optimal's legal counsel, Robert Hayes (Hayes), to Paar, Hayes demanded that HON comply with the Agreement and suggested that HON was in material breach of the Agreement because HON had not reviewed drafts that Optimal allegedly sent to HON regarding the Dealer Marketing Plan.

On May 4, 2009, Optimal filed this action against HON in the United States District Court for the Eastern District of Pennsylvania, alleging claims for breach of contract and breach of the Covenant of Good Faith and Fair Dealing. HON successfully moved to transfer venue to this Court. Optimal seeks to recover $20,946,972 in damages.

On November 15, 2010, HON moved for partial summary judgment, arguing that there are no genuine issues of material fact that most of the damages Optimal seeks are precluded by a limitation of liability clause within the Agreement. On November 15, 2010, Optimal also moved for partial summary judgment, arguing that there are no genuine issues of material fact that HON had no basis upon which to terminate the Agreement and therefore HON is liable as a matter of

law.  Optimal also argues that it is entitled to summary judgment on the issue of HON's affirmative defense that, pursuant to the Agreement, Optimal cannot recover the special or consequential damages that it seeks because Optimal does not seek those types of damages.

## II.  DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of establishing that there are no genuine issues of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Then, "[i]n order to create an issue for trial the nonmoving party must produce sufficient evidence to support a verdict in his favor based on more than 'speculation, conjecture, or fantasy.'"  Doe v. Dep't of Vet. Affairs, 519 F.3d 456, 460 (8th Cir. 2008) (quoting Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003)).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.

### B.  Contract Interpretation Principles[8]

"The determination of the intent of the parties at the time they entered into the contract is the cardinal rule of contract interpretation."  NevadaCare, Inc. v. Dep't of Human Servs., 783

---

[8] The Agreement provides that it is to "be governed by and construed in accordance with the laws of the State of Iowa, without regard to conflicts of laws provisions thereof."  Agt. Sect. 11.8, Def.'s App. 13, ECF No. 60-3.

N.W.2d 459, 466 (Iowa 2010) (citing <u>Walsh v. Nelson</u>, 622 N.W.2d 499, 503 (Iowa 2001)). "If the principal purpose of the parties is ascertainable from the words and other conduct of the parties in light of all the circumstances, we give those words and conduct great weight when interpreting the contract." <u>Id.</u> (citing <u>Pillsbury Co. v. Wells Dairy, Inc.</u>, 752 N.W.2d 430, 436 (Iowa 2008)); <u>see also</u> <u>id.</u> ("[T]he most important evidence of the parties' intentions at the time they entered into the contract is the words of the contract."). Further, "[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." <u>Pillsbury</u>, 752 N.W.2d at 436 (quoting Restatement (Second) of Contracts § 202(5) (1979)).

## C. Liability

Optimal moves for partial summary judgment on the issue of liability, arguing that "the Agreement clearly and unambiguously establishes that neither party may unilaterally terminate based upon material breaches without affording the breaching party an opportunity to cure." Pl.'s Br. 9, ECF No. 62-1. HON argues that summary judgment on the issue of liability is inappropriate because there is a genuine issue of material fact as to whether Optimal itself was in material breach of the Agreement at the time HON provided notice to Optimal of HON's intent to terminate the Agreement.

Section 8.1 of the Agreement specified that the Agreement would last for an initial term of five years. Section 8.2 of the Agreement provided for the mutual recision of the Agreement. Section 8.3 of the Agreement provided that one party may unilaterally terminate the Agreement if the other party materially breached the terms of the Agreement and failed to cure:

> <u>Termination for Material Breach</u>. In the event of a material breach of any pro-
> vision of this Agreement, the non-breaching party may terminate this Agreement
> by giving thirty (30) days prior written notice to the breaching party; provided,
> however, that this Agreement shall not terminate if the breaching party has cured
> the breach prior to the expiration of such thirty (30) day period, or if such breach
> cannot be cured within such thirty (30) day period, the breaching party has taken

> steps within such thirty (30) day period to the reasonable satisfaction of the non-
> breaching party to cure the breach and thereafter cured such breach as soon as
> possible, but in no event more than thirty (30) days thereafter.

Agt. Sect. 8.3, Pl.'s App. 10, ECF No. 61-1.  Finally, Section 8.4 provided for termination for

other causes, including insolvency or bankruptcy of one of the parties.  Optimal did not mutually

agree to rescind the Agreement, and neither party contends that the other was facing bankruptcy

or was otherwise insolvent.  Thus, only Section 8.3 is relevant to the Court's consideration.

HON argues that its termination of the Agreement was justified because Optimal's alleged

failure to work with HON in developing a Dealer Marketing Plan was a material breach of the

Agreement.  The Agreement provided for a marketing plan as follows:

> Marketing Plan.  Within sixty (60) days of the execution of this Agreement, the
> parties agree to develop a mutually agreeable "Dealer Marketing Plan."  The
> Dealer Marketing Plan will address, at a minimum, the following:
>
>> -Dealer and sales force education
>> -Team Selling (OI-HON-Dealer)
>> -Product advertising and promotions
>> -Local Tradeshows
>> -Press releases and/or success stories
>> -Annual Architecture & Design Local Market Blitz Annually [sic]
>> -End User School Projects Local Market Blitz Annually
>> -Publicity strategies
>> -A standard warranty offering to be included in the form Subscription Agreement
>> that is in accordance with industry standard for similar hosted applications.
>
> The Dealer Marketing Plan will be funded by "Annual Membership Renewal
> Fees" generated from the HON-OI Dealer Program in accordance with Exhibit
> A.  HON will be responsible for paying any additional fees and costs required to
> implement the Dealer Marketing Plan in accordance herewith.  The parties will
> meet in person or remotely at least one time per calendar quarter to mutually
> agree on the budget and use of such proceeds in connection with the Dealer
> Marketing Plan.  HON agrees to use good faith efforts to implement the Dealer
> Marketing Plan and to ensure that HON's resources are allocated in such a
> manner to maximize the revenue potential of the Application and Furniture
> sold therewith.

Agt. Sect. 4.2, Def.'s App. 6, ECF No. 66-3.[9]

HON argues that the generation of a marketing plan was very important to HON because HON had never been involved in introducing a software product to the marketplace. HON suggests that "the entire purpose of the Agreement was to market and sell access to a type of product which HON had no prior experience marketing." Def.'s Resistance Br. 4, ECF No. 66. Reinhart arranged for meetings between Reinhart, Harvey, and a marketing consultant to take place in late October 2008. Reinhart said that he "made [Harvey] aware that I thought we needed some outside help because time and effort that was not available to either one of us and the skill sets that [consultants] had." Reinhart Dep., Def.'s App. 27, ECF No. 66-3. Reinhart said that his expectation was that the fees for a consultant would be paid for with part of the $240,000 that HON had originally advanced to Optimal. However, Harvey chose not to meet with a consultant, and a final Dealer Marketing Plan was never developed.

Harvey admitted that he did not attend the meeting with a marketing consultant but said that he and Reinhart created "a plan of attack, so to speak, or a launch plan, that we spent a good amount of time on, parts of which in that launch plan had the beginnings of what would help us create a dealer marketing plan," and that "[Optimal]'s desire was to execute that plan and sign dealers quickly, because that's what we committed to HON we would do." Harvey Dep., Def.'s App. 67-68, ECF No. 66-4. Harvey continued that "[Reinhart] and I verbally agreed that while we were traveling together we would do the things necessary to create the dealer marketing plan." Id. at 68. Optimal also argues that the Agreement contained no explicit requirement that the parties retain a marketing consultant in order to help create the Dealer Marketing Plan or that Optimal was responsible for paying a consultant's fees.

---

[9] Under the terms of Amendment No. 1 to the contract, Section 4.2 of the original Agreement, which outlined the terms of the Dealer Marketing Plan, was "amended to delete the words 'within sixty (60) days of the execution of this Agreement' with 'within sixty (60) days after the date of this Amendment." Am. No. 1 to Agt., Pl.'s App. 22, ECF No. 61-1. Amendment No. 1 was executed on September 24, 2008.

Section 4.2 of the Agreement created an express duty for the parties to jointly develop a Dealer Marketing Plan within sixty days of the execution of the Agreement, the implementation of which would "maximize the revenue potential" of the Agreement. Agt. Sect. 4.2, Def.'s App. 6, ECF No. 66-3. There is no dispute that the parties never developed a Dealer Marketing Plan. Iowa has adopted the Restatement (Second) of Contracts to define  materiality of a breach. The Restatement

> looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party – to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure, and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected.

Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc., 599 N.W.2d 684, 692 (Iowa 1999) (quoting II E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 496-97 (2d ed. 1998) (citing Restatement (Second) of Contracts § 241)); see also Busing v. Iowa Dep't of Transp., Motor Vehicle Div., 455 N.W.2d 921, 923 (Iowa 1990) (noting that a material breach is one that is not casual, trivial, or technical).

The purpose of the Agreement was to secure subscriptions to the HON-OI Dealer Program. Section 4.2 provided that through the parties' joint efforts, a marketing plan would be developed to promote the HON-OI Dealer Program. Under the facts presented on summary judgment, the Court finds that reasonable minds could differ on whether Optimal's failure to attend meetings and/or cooperate in HON's efforts to secure the assistance of a marketing consultant in developing a Dealer Marketing Plan deprived HON of a benefit it reasonably expected under the Agreement, and thus materially breached the Agreement. The disputed facts regarding the development of the Dealer Marking Plan are for the trier of fact.[10] See Ryko Mfg. Co. v. Eden Servs.,

---

[10] HON also alleges in a footnote that Optimal materially breached the Agreement by not "provid[ing] HON with balance sheet information as required," under Section 4.5.2. Def.'s Resistance Br. 6, n.1, ECF No. 66. Section 4.5.2 of the Agreement required that Optimal

823 F.2d 1215, 1239 (8th Cir. 1987) ("Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, and materiality is an issue of fact for the jury." (internal citations omitted)); Des Moines Blue Ribbon Distribs. v. Drewrys, Ltd., U.S.A., Inc., 129 N.W.2d 731, 736-37 (Iowa 1964) (concluding that the issue of whether a distributor's performance of a distributorship agreement excused the brewery's unilateral termination of the distributorship agreement was a question of fact to be decided by the jury). Cf. Alliant Energy Corp. v. Alltel Corp., 344 F. Supp. 2d 1176, 1189-91 (S.D. Iowa 2004) (finding that, based on undisputed facts, the non-breaching party was not deprived of the benefit it reasonably expected by the breaching party's noncompliance with a term of the agreement, and therefore it was not a material breach and did not excuse the non-breaching party's termination of the agreement).

In a footnote, HON also alleges that Optimal breached the Agreement by not creating a business plan that Harvey agreed to create in a July 28, 2008, email to Lorenger, Paar, and Reinhart. Optimal argues that, as executed, the Agreement contains no requirement that Optimal supply HON with a business plan and that the Agreement contains an integration clause.

> When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated. Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence. The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated.

C & J Vantage Leasing Co. v. Wolfe, — N.W.2d —, 2011 WL 744633, at *16 (Iowa Mar. 4, 2011) (citation omitted). The Court makes the "preliminary determination[] that there is an integrated agreement . . ." Restatement (Second) of Contracts § 213, cmt. b (1981). "When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any

---

"provide balance sheet financial information to HON on a financial quarter bases." Agt. Sect. 4.5.2, Def.'s App. 7, ECF No. 60-3. The Court finds that genuine issues of material fact exist as to whether Optimal breached this provision of the Agreement and, if so, whether such a breach was material.

extrinsic evidence to contradict (or even supplement) the terms of the written agreement" Whalen v. Connelly, 545 N.W.2d 284, 290 (Iowa 1996) (citing Restatement (Second) of Contracts §§ 209, 213 (1981)). The parole evidence rule applies when a "handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the . . . agreement." Id. at 291.

Section 11.11 states that the document comprising the Agreement "represents the entire agreement between the parties as to the matters set forth in this Agreement and supersedes all prior or contemporaneous oral or written discussion and understandings between them . . . ." Agt. Sect. 11.11, Def.'s App. 14, ECF No. 60-3. Both HON and Optimal are sophisticated business entities and were represented by counsel in negotiating the Agreement. The Court has no facts upon which to decide to what degree HON and Optimal were of equal bargaining strength. Finally, given the breadth and specificity of the Agreement, the terms of the alleged requirement that Optimal provide HON with a business plan would be expected to have been included in the Agreement. The Court finds that the Agreement is fully integrated and therefore HON may not present extrinsic evidence in an attempt to show that Optimal was in material breach of an understanding that was not memorialized in the Agreement.[11]

Section 8.3 of the Agreement also requires that the non-breaching party provide notice and an opportunity for the breaching party to cure. It is undisputed that HON failed to provide Optimal with notice and an opportunity to cure. However, citing Larken, Inc. v. Larken Iowa City L.P., 589 N.W.2d 700 (Iowa 1998), HON argues that a genuine issue of material fact also

---

[11] HON also suggests that Optimal's alleged material breaches prevents Optimal from seeking damages arising out of HON's alleged breach of the Agreement. However, were the Court to accept HON's argument, the entire purpose of Section 8.3, allowing a party in material breach the opportunity to cure before the non-breaching party gained the right to terminate, would be nullified and HON would be permitted to escape the operation of the clause for which it bargained.

remains as to whether Optimal's alleged breaches substantially defeated the purpose of the contract and relieved HON of compliance with the notice and cure requirement of Section 8.3.

In Larken, hotel manager Larken, Inc. (Larken), alleged that Larken Iowa City Limited Partnership and Pine Hill Iowa, Inc. (Pine Hill), the owners of the hotel, breached a management agreement under which Larken provided hotel management services to Pine Hill. Larken alleged that Pine Hill was in breach because Pine Hill terminated the management agreement without first providing Larken notice and an opportunity to cure numerous defaults, as provided for under the management agreement. Id. at 700-02. Larken filed a declaratory judgment action against Pine Hill, and Pine Hill responded by filing a counterclaim, arguing that "the agreement could be terminated because Larken's breaches were incurable and the notice and opportunity-to-cure provisions were not Pine Hill's exclusive means to terminate the contract." Id. at 701. The district court

> found that [employees Larken supervised] purchased a dryer, a large screen television, cedar siding, and garage door repair services for personal benefit. Employees retained rebates for personal use on goods ordered for Holiday Inn purposes, and Larken failed to obtain Pine Hill's approval for three separate purchases totaling $37,320. On appeal Pine Hill focuses primarily on two breaches: Larken entered into an unauthorized telephone maintenance contract with LDDP, a long-distance telephone provider controlled by Larry Cahill, a principal of Larken. In addition, Pine Hill asserts that Larken misappropriated the rebates that should have been paid to Pine Hill, as owner.

Id. at 702. The court concluded that

> acts of self-dealing found by the district court were so serious that they frustrated one of the principal purposes of the management agreement, which was to manage the hotel in the best interests of the owner and to be honest and forthright in its dealings. Self-dealing is the antithesis of that purpose, and it violates the relationship of trust necessarily underlying such agreements.

Id. at 704. The court excused Pine Hill's failure to comply with the notice and opportunity to cure provision of the management agreement and concluded that Larken's breach of "its implied duty of honesty and fidelity went to the heart of the contract" and that no amount of repayment could ever restore Pine Hill's trust in Larken. Id. at 704-05.

Optimal attempts to distinguish <u>Larken</u> from the facts of this case by arguing that "[i]n the instant action, paragraph 8.2 [sic][12] of the Agreement applies only to material breaches. By providing that a party may terminate as a result of a material breach after notice and an opportunity to cure, paragraph 8.2 [sic] does not extend termination rights to nonmaterial breaches." Pl.'s Reply Br. 5, ECF No. 73. In effect, Optimal argues that the right to terminate the Agreement without notice, and an opportunity to cure should not be extended to HON in this case because Section 8.3 only provided for termination following a material breach, whereas the termination clause in the management agreement at issue in <u>Larken</u> expressly provided that "[a]ny [violation] of this Agreement may constitute grounds for termination of the License Agreement." <u>Larken</u>, 589 N.W.2d at 702. However, <u>Larken</u>'s holding is not as narrow as Optimal suggests. In <u>Larken</u>, the court stated that where the purpose of the contract had been frustrated by a "*vital* breach" unable to be cured, "it would have been sufficient to allow [the non-breaching party] to rescind the contract even if the contract had been in terms an absolute one for a fixed term with no right of termination at all; it seems strange to suggest that the right of immediate termination is lost because the parties expressly provided a means of terminating for lesser, curable breaches." <u>Id.</u> at 703 (quoting 6 Lawrence A. Cunningham & Arthur J. Jacobson, <u>Corbin on Contracts</u> § 1266, at 23 (1997 Supp.)). Indeed, <u>Larken</u> contemplates that even if a contract had no termination provision at all, a non-breaching party would still be entitled to terminate the contract in the event that the breaching party violated the contract in such a way that it frustrated a principal purpose of the contract that could not be cured. <u>See id.</u> at 703-04 (collecting cases and noting that numerous other jurisdictions have adopted a rule similar to <u>Corbin</u>'s position). Thus, even if Section 8.3 of the Agreement is read to provide more limited termination options than those found in the termination provision at issue in <u>Larken</u>, HON may still have had the right to terminate the Agreement without providing Optimal notice and an opportunity to cure so long as

---

[12] The Court assumes that Optimal's reference to Paragraph 8.2 of the Agreement, which outlines the right to terminate upon mutual agreement, was a typographical error and that Optimal intended to reference Paragraph 8.3, which outlines termination for material breach.

Optimal's alleged breach frustrated a principal purpose of the Agreement and that breach could not be cured.

However, because the Court has concluded that whether Optimal materially breached the Agreement such that a principal purpose of the Agreement was frustrated is a question for the finder of fact, likewise whether there is an adequate remedy is necessarily a question for the finder of fact. See Olin Corp. v. Central Indus., Inc., 576 F.2d 642, 648 (5th Cir. 1978) (cited with approval in Larken and holding that the question of whether a breach had the effect of substantially defeating the purpose of a contract, thus obviating the need for the non-breaching party to provide notice of the breach and an opportunity to cure, is a question for the trier of fact). The Court concludes that genuine issues of material fact exist both as to whether Optimal committed a material breach of the Agreement and, if so, whether HON was justified in terminating the Agreement without providing Optimal notice and an opportunity to cure as required by Section 8.3 of the Agreement. Therefore, Optimal's Motion for Partial Summary Judgment as to liability must be denied.

### D. Damages

Optimal seeks to recover $20,946,972 in damages. Optimal reached this figure by hypothesizing (1) that fifty dealers would have signed up under the program, resulting in additional implementation fees of $760,000; (2) that those dealers would have paid licensing fees to HON to purchase multiple Single Project Application Licenses, resulting in licensing fees of $13,365,000; and (3) that those fifty dealers would have modeled HON products through the application, resulting in royalties of $6,821,972. Of the $20,946,972 that Optimal seeks to recover, only $240,000 constituted a defined payment obligation on behalf of HON under the Agreement. See Agt. Ex. A, Def.'s App. 15, ECF No. 60-3 ("HON hereby agrees to purchase a minimum twenty four (24) memberships to the HON-OI Dealer Program" at a rate of $20,000 each. At the time that the Agreement was terminated, HON had pre-paid $240,000 for twelve memberships to the HON-OI Dealer Program.). The realization of the remaining fees Optimal

alleges that it is owed under the Agreement, $20,706,972, was contingent upon additional third-party dealers signing up for the HON-OI Dealer Program and paying implementation fees, dealers purchasing project application licenses, and dealers making sales in connection with modeling HON products through IOPro.[13]

HON argues that the additional damages Optimal seeks are properly categorized as lost profits and that Optimal cannot recover these damages because the Agreement's limitation of Liability Clause, Section 9, precludes the recovery of all lost profits. HON further argues that even if Section 9 does not preclude the recovery of all lost profits, Section 9 precludes the recovery of consequential lost profits and that the lost profits Optimal seeks are consequential both because, under Iowa law, all lost profits are by definition consequential and because collateral third-party contracts needed to come to fruition before any profits would have been earned under the Agreement.

Optimal argues that the damages it seeks should not be categorized as lost profits. However, even if the damages Optimal seeks were categorized as lost profits, Optimal argues that Section 9 only precludes the recovery of consequential lost profits and does not foreclose the opportunity to recover direct lost profits. Optimal further suggests that Iowa does not categorize all lost profits as consequential by definition and that the specific damages Optimal seeks in this case are not consequential because the damages arose directly out of HON's alleged breach of the Agreement.

---

[13] The Court's discussion on damages, see infra sections II.D.1-4, does not pertain to the additional $240,000 that HON agreed to pay Optimal for the additional twelve memberships to the HON-OI Dealer Program. Although HON does not admit that it has an obligation to pay Optimal an additional $240,000, "HON concedes that this $240,000 is a defined payment obligation that it expressly undertook in entering the Agreement," and therefore does not seek summary judgment with respect to these claimed damages. Def.'s Reply Br. 2, ECF No. 69.

### 1. Categorization of Damages Sought

Based upon the motions before the Court, the Court must determine whether some of the damages Optimal seeks are categorized as lost profits.[14]  HON argues that Optimal seeks to recover lost profits because Optimal is attempting to recover what

> it alleges it would have received from dealers signing up for the 'HON-OI Dealer Program' and purchasing 'Single Single [sic] Project Application Licenses.'  It does not seek damages it claims to be owed based on dealers *actually* signing up and licensing the Application, or even damages based on costs that it incurred in demonstrating or marketing the Application to various dealers or other entities.

Def.'s Br. 17, ECF No. 60-1.

In Iowa,

> Judicial remedies for breach of contract serve to protect one or more of the following interests of the promisee: (a) "Expectation interest" in having the benefit of the bargain, placing the promisee in as good a position as if the contract had been fully performed; (b) "Reliance interest" in reimbursement for the loss caused by reliance on the contract, placing the promisee in as good a position as if the contract had not been made; or (c) "Restitution interest" in having restored to the promisee the benefit conferred upon the party in breach.

Potter v. Oster, 426 N.W.2d 148, 150 (Iowa 1988) (citing Restatement (Second) of Contracts § 344 (1979)).  Here, Optimal seeks to recover its expectation or benefit of the bargain interest.  "Recovery based on expectation interest may include lost profit because the promisee is reimbursed for the actual value of the contract had it been performed."  Id.; see also Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp., 535 N.W.2d 149, 156 (Iowa Ct. App. 1995) (defining lost profits as those "which would have been realized had the contract been performed"); Black's Law Dictionary, 1032 (9th ed. 2009) (defining lost profits as "[a] measure of damages that allows a seller to collect the profits that would have been made on the sale if the buyer had not breached").  "'Profits' represent the net gain made from an investment, or from the

---

[14] HON argues that Optimal seeks lost profits and/or lost revenues.  Although the Court notes that an accounting distinction differentiates lost profits from lost revenues, for simplicity, the Court will singularly refer to lost profits.

prosecution of some business." <u>Mitchell v. Chi., R.I. & P. Ry. Co.</u>, 114 N.W. 622, 625 (Iowa 1908).

Optimal admits that it seeks to recover over $20 million in damages, which includes damages to cover expected profits from dealer implementation fees, licensing fees, and royalties. Optimal argues, however, that these damages are not lost profits because "it seeks to recover the implementation fees, license fees and royalties HON was obligated to pay under the Agreement. . . . [and] does not offset these amount by any cost of performance because the IOPro application was developed at the time the parties entered into the Agreement." <u>See</u> Pl.'s Resistance Br. 6, ECF No. 65. Assuming arguendo that the monies Optimal allegedly would have derived from the implementation and continued use of IOPro did not need to be offset by Optimal's operating costs because IOPro was already developed, such a distinction does not change the character of the damages Optimal seeks to recover.

Without supportive legal authority, Optimal next argues that the damages it seeks to recover are not lost profits or revenues because "[t]here was no direct relationship between Optimal and HON's dealers. . . . It was contemplated that dealers would enter into agreements with HON to which Optimal would not be a party and pay HON (not Optimal) for the use of the IOPro application." Pl.'s Resistance Br. 7, ECF No. 65. However, Optimal fails to explain how the source of the revenue it expected to receive alters the legal character of that revenue. Further, Optimal contradicts this depiction by asserting that lost profits can be either direct or consequential; defining as direct those profits lost on the contract at issue and as consequential those profits lost on contracts collateral to the contract at issue. The Court finds that the damages Optimal seeks are "profits that would have been made on the sale" and continued use of IOPro and therefore are, by definition, lost profits. <u>See</u> Black's Law Dictionary, 1032 (9th ed. 2009) (defining lost profits). <u>See also</u> Section D-3, <u>infra</u>.

## 2. Limitation of Liability Clause

Both parties move for summary judgment on the issue of whether the Agreement's limitation of liability clause, Section 9, precludes the recovery of both direct and consequential lost profits. HON argues that the language of Section 9 prevents the recovery of all lost profits because Section 9, in precluding recovery for consequential damages, effectively defines all lost profits *as* consequential damages. Optimal, disagrees, arguing that Section 9 does not preclude the recovery of direct damages, which Optimal defines as "benefit of the bargain damages" that "HON expressly agreed to provide in the Agreement." Pl.'s Br. 14, ECF No. 62-1. This issue must be analyzed first with regard to the import of the specific language of Section 9, but then also in the context of Iowa law which governs how Section 9 is to be construed.

Section 9 provides that

> EXCEPT FOR OI'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 10 BELOW, ***UNDER NO CIRCUMSTANCES WHATSOEVER WILL EITHER PARTY BE LIABLE UNDER ANY THEORY OF LIABILITY FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR REVENUES***, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES. OI'S AND ITS LICENSORS' SOLE AGGREGATE LIABILITY HEREUNDER, IF ANY, SHALL IN NO EVENT EXCEED THE FEES PAID BY HON DURING THE IMMEDIATELY PRECEEDING [sic] 6 MONTH PERIOD PRIOR TO THE DATE OF THE CLAIM FOR THE APPLICABLE PRODUCT OR SERVICE THAT GAVE RISE TO THE CLAIM.

Agt. Sect. 9, Def.'s App. 11, ECF No. 60-3 (emphasis added).

The disputed term at issue is the phrase "including, without limitation" as found in Section 9. The interpretation of this phrase "involves a two-step process. First, from the words chosen, a court must determine 'what meanings are reasonably possible.'" Walsh, 622 N.W.2d at 503 (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). The Court finds that there are two reasonably possible interpretations of the phrase "including, without limitation" as utilized in Section 9. First, the phrase could be read to define lost profits or revenues as special, incidental, or consequential damages, as HON urges the Court to find. Alternatively, as Optimal

argues, the phrase could be read to signify that "lost profits or revenues" are merely a type of special, incidental, or consequential damages, and thus the phrase "including, without limitation" was merely meant to connote that the object following the clause is illustrative. "Once an ambiguity is identified, the court must then 'choos[e] among possible meanings.'" Id. (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87 (1981)). Because the interpretation in this case does not depend upon extrinsic evidence, the matter is properly resolved by the Court as a matter of law. See Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999). Although "the disputed language and the parties' conduct must be interpreted 'in the light of all the circum-stances,'" Walsh, 622 N.W.2d at 503 (quoting Fausel, 603 N.W.2d at 618), "the words of an integrated agreement remain the most important evidence of intention," id. (quoting Restatement (Second) of Contracts § 212, cmt. b (1981)).

In support of its position that Section 9 of the Agreement does not preclude the recovery of direct lost profits, Optimal cites Penncro Associates, Inc. v. Sprint Spectrum, L.P., 499 F.3d 1151 (10th Cir. 2007). At issue before the court in Penncro was the dissolution of a three-year agreement under which Penncro would supply bill collection services to Sprint. Id. at 1152. Sprint became dissatisfied with Penncro's performance and gave Penncro notice of Sprint's intent to terminate the agreement. Id. Sprint argued that a limitation of liability clause within the agreement precluded Penncro from recovering any lost profits. Id. at 1155.

The limitation of liability clause at issue in Penncro "rule[d] out the award of consequen-tial damages and proceed[ed] to define the term as 'includ[ing], but . . . not limited to, lost profits, lost revenues and lost business opportunities." Id. at 1155. Affirming the district court, the Tenth Circuit Court of Appeals held that the limitation of liability clause only precluded the recovery of those lost profits that were consequential in nature and did not preclude the recovery of those lost profits which arose directly out of the agreement. Id. at 1156. The court reasoned that "[t]he more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages." Id. (quoting Webster's Third New International

Dictionary, 1143 (2002)).  The court went on to note that the limitation of liability provision at issue stated that "no consequential damages are recoverable, 'includ[ing]' lost profits; it simply does not speak to direct damages, or to lost profits recoverable under such a theory."  Id.

In support of its interpretation of Section 9, HON directs the Court to Quicksilver Resources, Inc. v. Eagle Drilling, L.L.C., No. H-08-868, 2009 WL 1312598 (S.D. Tex. May 8, 2009).  In Quicksilver, under the terms of the agreement at issue, "Eagle was to perform drilling services for Quicksilver in connection with their natural gas exploration and production operations in Texas."  Id. at *1.  Eagle assigned its duties to Eagle Domestic Drilling Operations, L.L.C. (EDDO), and after EDDO failed to complete the assigned duties according to the specifications provided for under the agreement, Quicksilver filed an action against both Eagle and EDDO.  Id. at *2-3.  Faced with the task of interpreting a limitation of liability clause that stated, in part, that "special, indirect, or consequential damages *shall be deemed to include, without limitation*, the following:  loss of profit or revenue . . ." id. at *5 (emphasis added), the court distinguished the "include without limitation" phrase from limitation of liability clauses that utilize the phrase "include, but are not limited to," and found that "the agreement manifests a clear intent by the parties to modify the legal meaning and breadth of the term 'consequential damages,'" and barred all lost profits or revenues from recovery, id. at *7.

Focusing solely on the language in the Agreement, the Court finds the well reasoned analysis of the Tenth Circuit in Penncro persuasive as to the discrete issue of whether the language "including, without limitation" was intended to define all lost profits as consequential damages.  Despite the Quicksilver court's attempt to distinguish between the phrases "including, but not limited to" and "including, without limitation" the Court finds no material distinction between the phrases either in the context of everyday English or in the context of contractual drafting.  As used in the context of Section 9, the word "include" is defined as "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate."  Webster's Third New International Dictionary, 1143 (2002).  "Limit" is defined as "something that bounds,

restrains, or confines." Id. at 1312. The words "but not" and "without" are merely two ways of conveying the negative of an expression. See Black's Law Dictionary, 831 (9th ed. 2009) (defining the word "include" and noting that "some drafters use phrases such as *including without limitation* and *including but not limited to* – which mean the same thing"). Thus, the phrases "including, without limitation," and "including, but not limited to" both introduce items that comprise *a part* of a greater group, class or aggregate. The Court agrees with the Tenth Circuit that "[t]he more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages." Penncro, 459 F.3d at 1156; see also Fed. Land Bank of Omaha v. Bollin, 408 N.W.2d 56, 60 (Iowa 1987) ("It is the court's duty to give effect to the language of the contract in accordance with its plain and ordinary meaning and not make a new contract for the parties by arbitrary judicial construction."). Therefore, the Court finds that, as used in Section 9, "lost profits or lost revenues" are merely illustrative of the *types* of special, incidental, or consequential damages that are disclaimed and that, in theory, neither Optimal nor HON would be precluded from recovering direct lost profits. See Penncro, 459 F.3d at 1156; Peter Kiewit Sons' Inc. v. ASTER, LP, No. 8:08CV541, 2010 WL 1417811, at *3 (D. Neb. Apr. 1, 2010) (finding that a limitation of liability clause that reads no party shall be "liable for conse-quential, incidental, indirect or special damages, including but not limited to lost profits, . . ." did not preclude the recovery of lost profits that are direct in nature because the term "lost profits" as used in the limitation of liability clause merely illustrated an example of "'consequential, inci-dental, indirect, or special damages,' but can also be [an] example[] of direct damages"); Claredi Corp. v. SeeBeyond Tech. Corp., No. 4:04CV1304, 2010 WL 1257946, at *5-6 (E.D. Mo. Mar. 26, 2010) (applying California law and finding that limitation of liability clause that stated "NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL OR

CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF ANTICI-

PATED PROFITS OR BENEFITS .    " did not bar the recovery of anticipated profits that were

direct in nature, reasoning that "[a] plain reading of [the limitation of liability provision] limits

only *indirect* loss of profits and not lost profits which are direct damages, that is, damages which

naturally arise out of the breach and which were within the reasonable contemplation of the

parties at the time the contract was formed"); <u>Ingraham v. Planet Beach Franchising Corp.</u>, No.

07-3555, 2009 WL 1076713, at *1-2 (E.D. La. Apr. 17, 2009) (reasoning that a limitation of

liability term that disclaimed recovery for "consequential damages (including, without limitation,

lost profits) . . ." but also specifically provided for the recovery of actual damages could be

reconciled to mean that "'lost profits' which can be proved to have resulted directly from the

opening of a new franchise are recoverable, but that unless that connection is clearly established,

than any lost profits that indirectly came about, are not").

### 3.   Lost Profits Under Iowa Law

Although in isolation Section 9 does not foreclose the recovery of direct lost profits, HON

argues that, under Iowa law, all lost profits are necessarily considered consequential damages,

and thus when Section 9 is construed under Iowa law, the damages Optimal seeks to recover are

disclaimed by the operation of Section 9.  Optimal resists, arguing that it is unclear whether,

under Iowa law, all lost profits are necessarily categorized as consequential damages, and that if

the Iowa Supreme Court decided the issue, it would most likely find a distinction between direct

and consequential lost profits.[15]  The Court has concluded the state of pertinent Iowa law,

applicable under the terms of the Agreement and known to these sophisticated parties at the time

---

[15] Optimal has not asked the Court to certify a question to the Iowa Supreme Court
regarding the nature of lost profit damages.

of contracting, breathes life into Section 9, incorporating the context of the entire agreement.

See generally Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1070 (8th Cir. 2000).[16]

In Iowa, "the measure of damages is the amount which will compensate the injured person

for the loss which a fulfillment of the contract would have prevented or the breach of it has

entailed." DeWaay v. Muhr, 160 N.W.2d 454, 458 (Iowa 1968) (quoting 25 C.J.S. Damages §

74). Thus, "compensatory damages are designed to put the injured party in as good a position as

he would have had if performance had been rendered as promised." Id. ("Otherwise stated, the

measure of damages is the actual loss sustained by reason of the breach, which is the loss of what

the promisee would have made if the contract had been performed, less the proper deductions."

(quotation omitted)). "Two types of damages may be awarded in breach of contract actions,

general damages and special or consequential damages." Macal v. Stinson, 468 N.W.2d 34, 36

(Iowa 1991). Iowa has adopted the rule of Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep.

145 (1854),

> such damages as may fairly and reasonably be considered as arising naturally -
> that is, according to the usual course of things-from the breach, or such as may
> reasonably be supposed to have been in the contemplation of both parties at the
> time they made the contract, as the probable result of the breach. While it has
> been said Hadley v. Baxendale lays down two rules, the better view seems to be
> that the second part of the rule is sufficient to cover all cases of breach of con-
> tract for it must be presumed the parties would contemplate that the party injured
> by the breach would sustain such damages as would fairly and reasonably, in the
> usual course of things, result therefrom.

DeWaay, 160 N.W.2d at 459 (citation omitted). The DeWaay court reasoned that the rule in

Hadley "does not materially differ from that stated supra in C.J.S. and Am. Jur. 2d, and adopted

in the recent Iowa decisions before cited, nor from the second paragraph of [Iowa Code] section

554.68 [(1962)], [. . . ] '[The measure of damages is] the loss directly and naturally resulting in

the ordinary course of events from the seller's breach of contract.'" Id. Utilizing that

---

[16] See also note 18, infra.

interpretation, the Iowa Supreme Court adopted the rule on the recovery of profits found in

C.J.S., which states,

> On the breach of a contract, the party not in default may generally recover the profits which would have resulted to him or her from the contract's performance, provided the loss is ascertainable with reasonable certainty, and naturally and proximately results from the breach, and the profits claimed are not speculative or conjectural and were within the contemplation of the parties when the contract was made.
>
> The party not in default is, in a case of a breach of contract due to the fault or omission of the other party, entitled to recover profits which would have resulted to him or her from the contract's performance.  In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made.  However, absolute certainty is not called for or required.
>
> Lost profits are recoverable only when it reasonably or definitely appears that they would have been made if the contract had been performed, and where it reasonably and definitely appears that their loss necessarily followed the breach.  A recovery of speculative, conjectural, remote, or contingent profits will be denied.  Reasonable certainty of proof is, however, sufficient to satisfy the requirement of this rule.  Certainty is required only as to the showing of loss of profits and not of the amount.  Doubts as to profits as an element of damage are generally resolved against the party committing the breach of contract.

25 C.J.S. Damages, § 60.

Although Optimal suggests that the issue of whether lost profits may be considered direct damages has yet to be decided by an Iowa court, the Court finds that a fair reading of Iowa law reveals that lost profits are routinely regarded as consequential damages and not as direct damages.  Iowa courts have continually recognized that lost profits may be recoverable as consequential damages.  For example, in Yost v. City of Council Bluffs, 471 N.W.2d 836, 840 (Iowa 1991), the court considered a claim, *inter alia*, for lost profits and noted that "[u]nder Iowa law, when a contract has been breached, the innocent party is generally entitled to be placed in a position he would have occupied had there been performance."  Id. at 840 (quoting Lakota Scout

Council, Inc. v. Havey Fund-Raising Mgmt., Inc., 519 F.2d 634, 639-40 (8th Cir. 1975)).  The court then noted that foreseeability is the focus in determining damages such as lost profits, and that "[t]hese damages are generally categorized as consequential damages."  Id. (citing Lakota Scout Council, 519 F.2d at 640).  More recently, the Iowa Court of Appeals further clarified Iowa's position on the categorization of lost profits, and explicitly stated in Car Wash Consultants, Inc. v. Belanger, Inc., No. 08-1195, 2009 WL 3775101, at *5 (Iowa Ct. App. Nov. 12, 2009) (unpublished table decision), that "[l]ost profits are a form of consequential damages."  See also 6305 SW 9th St., L.L.C. v. Sons of Geil, L.L.C., 743 N.W.2d 870, at *5 (Iowa Ct. App. 2007) (unpublished table decision) ("The non-breaching party may also seek consequential damages, including lost profits." (citing Potter, 426 N.W.2d at 150)).[17]

Therefore, when Section 9 of the Agreement is construed under Iowa law, Section 9's prohibition on the recovery of consequential damages necessarily precludes Optimal's ability to recover any lost profits under the Agreement.[18]

---

[17] Optimal urges the Court to find that lost profits may be recoverable as either direct damages or consequential damages under Iowa law.  See Pl.'s Resistance Br. 9, ECF No. 65 (citing Penncro, 499 F.3d at 1151; Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007); Valve Corp. v. Sierra Entm't Inc,, 431 F. Supp. 2d 1091, 1100-01 (W.D. Wash. 2004); DP Serv., Inc. v. AM Int'l, 508 F. Supp. 162, 166-67 (N.D. Ill. 1981); Cherokee County Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade, 305 S.W.3d 309, 314-15 (Tex. App. 2009); and Deck House, Inc. v. Link, 249 S.W.3d 817, 825 (Ark. App. 2007)). However, the Court has adopted the explicit term of Section 11.8 of the Agreement to construe the contract under Iowa law.

[18] Even if all lost profits were not categorized as consequential damages under Iowa law, the Court finds that the damages Optimal seeks to recover are consequential.  Optimal alleges that had the Agreement not been terminated, Optimal would have earned over twenty-million dollars during the first five years of the Agreement.  The profits Optimal alleges it would have earned were entirely contingent on collateral deals between other parties, including the realization of HON dealers contracting with HON to join the HON-OI Dealer Program, HON dealers deciding to purchase project application licenses, and HON dealers completing sales of HON product to customers.  HON's only defined payment obligations under the Agreement were to purchase twenty-four memberships for a total of $480,000.  Because the remainder of the profit Optimal alleges it would have earned under the Agreement was entirely contingent on collateral

### 4.  Enforcement of Section 9

Under Iowa law, parties may contract to limit consequential damages.  See Iowa Code §
554.2719.  However, a contract provision that limits the recovery of consequential damages will
not be enforced in two circumstances: (1) "[w]here circumstances cause an exclusive or limited
remedy to fail of its essential purpose, remedy may be had as provided in this chapter," or
(2) where the limitation of liability clause is unconscionable.  Iowa Code § 554.2719.  Optimal
does not allege that the remedy would fail of its essential purpose or that the limitation of
liability clause is unconscionable.  Rather, Optimal, citing to no Iowa cases, alleges that HON
acted in bad faith and therefore asserts that there is a genuine issue of material fact as to whether
Section 9 is enforceable.

Assuming arguendo that Iowa would adopt a bad faith standard in the contractual situation
present in this case, see, e.g. Dickinson Co. v Iowa State Dep't of Transp., 300 N.W.2d 112, 114
(Iowa 1981) (considering bad faith as a defense to the operation of a "no damage" clause with
respect to a state contract), Optimal has failed to provide any record tending to show the scienter
required to maintain such a public policy argument preventing the application of a limitation of
liability clause.  For instance, Optimal argues that HON acted in bad faith because the Agree-
ment originally provided that HON would make an initial payment to Optimal of $240,000 to
compensate Optimal for the cost of twelve dealer licenses, but that the parties later agreed to
amend the Agreement such that HON remitted the $240,000 to Optimal in four $60,000 pay-
ments.  However, Optimal fails to explain how this amendment, to which both parties agreed,
constitutes bad faith on the part of HON.  Optimal also argues that HON "terminated the

---

third-party agreements, the Court must find that the remainder of Optimal's claim is a claim for
consequential damages, and therefore Optimal is precluded from recovery these damages by
operation of Section 9.  This inherent contingency characterizes the nature of these damages and
further elucidates the contemplation of the parties when entering into a contract containing
Section 9 which was to be construed under Iowa law.

program simply because of a change in corporate direction and deterioration in the economy."
Pl.'s Resistance Br. 12, ECF No. 65. Yet, even if this is true, such a fact would not constitute bad faith as defined under the law. The Court finds that there is no basis in the record to support a claim of bad faith, and therefore Section 9 is not unenforceable because HON acted in bad faith.

## III.    CONCLUSION

Based on the foregoing discussion, HON's Motion for Partial Summary Judgment (ECF No. 60) must be **granted**. Optimal's Motion for Partial Summary Judgment (ECF No. 61) must be **denied**.

**IT IS SO ORDERED.**

Dated this 14th day of March, 2011.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT